IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

GREGORY LYNN BROWN            §
                             §
VS.                          §        ACTION NO. 4:10-CV-375-Y
                             §
MICHAEL J. ASTRUE,           §
Commissioner of Social Security §

## OPINION ON APPEAL

Plaintiff Gregory Lynn Brown filed this action seeking judicial review of a final decision of the Commissioner of Social Security denying his claims for disability-insurance benefits under Title II and supplemental-security-income ("SSI") benefits under Title XVI of the Social Security Act ("SSA"). 42 U.S.C.A. §§ 405(g), 1383(c)(3) (2010).  In November 2007, Brown filed applications for Titles II and XVI benefits alleging that he became disabled on October 31, 2007. After his application was denied both initially and upon reconsideration, he requested and was granted a hearing before an administrative law judge ("ALJ"), which was held on March 17, 2009.  The ALJ issued an unfavorable decision on April 29. As a result, Brown sought review by the appeals council.  The appeals council denied review, thus leaving the ALJ's decision as the final decision of the Commissioner. Brown now seeks this Court's review of that decision.

## I.   Standard of Review

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA.  In addition, numerous regulatory provisions

govern disability-insurance and SSI benefits. *See* 20 C.F.R. Pt. 404 (disability insurance); 20 C.F.R. Pt. 416 (SSI). Although technically governed by different statutes and regulations, "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). In determining whether a claimant is disabled and thus entitled to disability benefits, the Commissioner employs a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. *See* 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(C), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1100-01 (5th Cir. 1985). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment set out in the listing of impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work.

*Id.* §§ 404.1520(e), 416.920(e).  And "[f]ifth, the impairment must prevent the claimant from doing any relevant work, considering the claimant's residual functional capacity, age, education, and past work experience." *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *see* 20 C.F.R. §§ 404.1520(f), 416.920(f).  "At steps one through four, the burden of proof rests upon the claimant to show that he is disabled." *Crowley*, 197 F.3d at 198.  If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments.  *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988).  "Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion." *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000) (quoting *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995)).  It is more than a mere scintilla, but less than a preponderance.  *Id.*  "A finding that substantial evidence is lacking is appropriate only if no credible evidentiary choices or medical findings support the decision." *Id.*  This Court may neither reweigh the evidence in the record nor substitute its judgment for that of the Commissioner, but instead will carefully scrutinize the record

to determine if substantial evidence is present.  *See id.; Hollis*, 837 F.2d at 1383.

## II.  Issues

1.   Whether the ALJ erred in finding that Brown had the residual functional capacity for a full range of light work.

2.   Whether the hypothetical question to the vocational expert failed to include all of Brown's limitations as a result of his impairments as established in the record.

## III.  Discussion

In his decision, the ALJ analyzed Brown's claim pursuant to the five-step evaluation process.  At step one, the ALJ determined that Brown had not engaged in substantial gainful activity since October 31, 2007, the alleged onset date.  (R. 16.)  At step two, the ALJ found that Brown had the following "severe" impairments:  diabetic neuropathy, hypertension, amputation of his lower left leg, history of right-leg peripheral neuropathy, obesity, and coronary artery disease.  (*Id.*)  At step three, the ALJ determined Brown did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 17.)  After finding Brown's subjective complaints not fully credible, the ALJ next determined that Brown retained the residual functional capacity ("RFC") to perform the full range of light work, with some accommodations,[1] but to include "standing and walking, off and on, for a total of 6 hours out of an 8-hour workday."

---

[1]The ALJ concluded that Brown was "further limited to jobs requiring an option to sit or stand at will and to elevate his legs 6-8 inches; only occasional balancing; and no climbing ladders, ropes, or scaffolds; and he uses a cane to ambulate and has a prosthesis for a below-knee amputation." (R. 17.)

(*Id.*)  At step four, the ALJ determined that Brown was unable to perform any of his past relevant work as a custodian.  (R. 20.) Nevertheless, at step five, the ALJ concluded, based upon his assessment of Brown's RFC and testimony at the hearing provided by a vocational expert, that Brown could perform other work in the national economy, such as that of a bench assembler or inspector. (R. 20.)  Thus, the ALJ concluded that Brown was not disabled at any time through April 27, 2009, the date of his decision.[2]  (R. 21.)

Brown contends that the ALJ erred in concluding that he had the RFC to perform the full range of light work.  He complains that the ALJ erred by failing to include his Charcot's joint disease and venous insufficiency as severe impairments at step two, and that the ALJ's RFC determination is not based on substantial evidence.

1.  Severe Impairment

The Commissioner has issued regulations defining a severe impairment as one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* 20 C.F.R. §§ 404.1521(a) (defining "non-severe impairment" as an impairment that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities"), 416.921(a) (same).  The United States Court of Appeals

---

[2]Brown's reply brief indicates that he was subsequently approved for disability benefits on a new application, with the Commissioner concluding that he became disabled on April 28, 2009, the day following the ALJ's decision in this case.  According to Brown, "[h]ad this determination been made while the case was still at the Appeals Council, Social Security's POMS would require that this case be reviewed to reconcile the decisions."  (Brown's Reply (doc. 18) 6.)

for the Fifth Circuit, however, has concluded that a literal application of that definition is inconsistent with the statutory language and legislative history of the SSA. *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985). Accordingly, in the Fifth Circuit, an impairment is **not** severe "only if it is a slight abnormality having *such minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Id.* 1102-03 (emphasis added). This severity standard does not allow for *any* interference with work ability, not even minimal interference. *Scroggins v. Astrue*, 598 F. Supp. 2d 800, 805 (N.D. Tex. 2009) (Lindsay, J.) ("*Stone* provides no allowance for a minimal interference on a claimant's ability to work."). The Court notes with dismay that the ALJ failed to apply the Fifth Circuit's standard in assessing the severity of Brown's impairments.[3]  (R. 15.)

The Commissioner contends that the ALJ nonetheless found Brown's "right leg peripheral neuropathy" to be a severe impairment, and that

---

[3]Nor did the ALJ cite or refer to the Fifth Circuit's decision in *Stone* or otherwise indicate that he was using that construction of the term "severe impairment." Such a failure generally requires remand. *See Stone*, 752 F.2d at 1106; *see also Loza v. Apfel*, 219 F.3d 378, 392-93 (5th Cir. 2000) (remanding based upon failure to apply *Stone* standard to determine whether mental impairments were severe even though the ALJ found severe physical impairments); *Luna v. Astrue*, No. 3:09-CV-1436-A, 2010 WL 582151, *4, 6-7 (N.D. Tex. Feb. 18, 2010) (Lynn, J.) (reversing Commissioner's decision based upon failure to apply *Stone* standard even though ALJ proceeded beyond step two); *Scroggins*, 598 F. Supp. at 803, 805-07 (same); *but see Stone v. Astrue*, No. 4:08-CV-598-A, 2010 WL 2164414, at *2 (N.D. Tex. 2010 (McBryde, J.) (declining to reverse on grounds that *Stone* standard not used to determine severity of claimant's obesity, where his obesity was taken into consideration by ALJ at all other steps of the process); *Bradshaw v. Astrue*, No. 1:07-CV-0150-C, 2008 WL 4387087, at *5-6 (N.D. Tex. Sept. 26, 2008) (Lane, Mag. J.) (concluding that rulings subsequent to *Stone* "have clarified the holding to require remand only when the ALJ failed to reference the *Stone* standard and the case was adjudicated at step 2 of the sequential evaluation process").

"peripheral neuropathy" includes Charcot's joints and venous insufficiency.  The Court is not so convinced.  The government cites to three pages of *The Merck Manual*" in support of its position, but does not quote from this source or provide the Court with copies of the cited pages.  (Gov't.'s Resp. 8.)  And from what the Court has found online, it appears that although peripheral neuropathy apparently often causes Charcot's joints, it is not clear that it necessarily includes it.[4]  In any event, if the ALJ adequately

_____

[4]For example, the online version of *The Merck Manual for Health Care Professionals* provides, in a section on "diabetic neuropathy" under "diabetes mellitus," as follows:

> Symmetric polyneuropathy is most common and affects the distal feet and hands (stocking-glove distribution); it manifests as paresthesias, dysesthesias, or a painless loss of sense of touch, vibration, proprioception, or temperature.  In the lower extremities, these symptoms can lead to blunted perception of foot trauma due to ill-fitting shoes and abnormal weight bearing, which can in turn lead to foot ulceration and infection or to fractures, subluxation, and dislocation or destruction of normal foot architecture (Charcot's joint).

THE MERCK MANUAL FOR HEALTH CARE PROFESSIONALS, *Diabetes Mellitus*, http://www.merckmanuals.com/professional/print/endocrine_and_metabolic_disorders/diabetes_mellitus_and_disorders_of_carbohydrate_metabolism/diabetes_mellitus_dm.htm (last visited Sept. 16, 2011).

Similarly, the online version of *The Merck Manual Home Health Handbook* provides that

> diabetic neuropathy commonly causes painful tingling or burning sensations in the hands and feet . . . . Pain is often worse at night and may be aggravated by touch or by a change in temperature.  People may lose the sense of temperature and pain, so they often burn themselves and develop open sores cause by prolonged pressure or other injuries.  Without pain as a warning of too much stress, joints are susceptible to injuries.  This type of injury is called Charcot's joints.

THE MERCK MANUAL HOME HEALTH HANDBOOK, *Polyneuropathy,* http://www.merckmanuals.com/home/brain_spinal_cord_and_nerve_disorders/peripheral_nerve_disorders/polyneuropathy.html?qt=diabetic neuropathy&alt=sh) (last visited Sept. 16, 2011).  This manual further defines Charcot's joints as

> progressive joint destruction, often very rapid, that develops because people cannot sense pain and thus are not aware of the early signs of joint damage. . . . If the disorder progresses rapidly, the joint can become extremely painful.  In these cases, the joint is usually swollen because of excess fluid and abnormal bone growth.  It may look deformed because it has been fractured and ligaments

considered Brown's joint disease and venous insufficiency in determining his RFC, the failure to separately designate them as severe impairments might not necessitate remand. *See, e.g., Stone*, 2010 WL 2164414, *3.  The Court concludes, however, that he did not.


2.   RFC

RFC is what an individual still can do despite his limitations.[5] Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996).  It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id.; see Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).  A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule.  SSR 96-8p at *2. RFC is not the least an individual can do, but the most.  *Id*.  The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered, and is based upon all of the relevant evidence in the case record.  *Id.* at *3-5. An ALJ will discuss the claimant's ability to perform sustained work activity on a regular and continuing basis and will resolve any inconsistencies in the evidence.  *Id.* at *7.  In making an RFC

---

have stretched, allowing the bones to slip out of place.  Moving the joint may cause a coarse, grating sound because of bone fragments floating in the joint. The joint may feel like a "bag of bones."

*Id., Charcot's Joints,* http://www.merckmanuals.com/home/bone_joint_and_muscle_disorders/joint_disorders/charcots_joints.html?qt=Charcot's&alt=sh (last visited Sept. 16, 2011).

[5]An ALJ's analysis at steps four and five of the disability evaluation process is based on the assessment of the claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 462 (5th Cir. 2005).  An ALJ assesses the RFC before proceeding from step three to step four.  *Id.* at 461.

assessment, an ALJ must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, and must consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe. *See* 20 C.F.R. §§ 404.1529, 416.929, SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996); SSR 96-8p at *5. The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social-security rulings also caution that presumptions, speculation, and supposition do not constitute evidence. *See, e.g.,* SSR 86-8, 1986 WL 68636, at *3 (S.S.A. 1986), *superseded by* SSR 91-7c, 1991 WL 231791, at *1 (S.S.A. Aug. 1, 1991) (only to the extent the SSR discusses the former procedures used to determine disability in children).

The medical evidence in the record regarding Brown's right leg, though sparse, nevertheless indicates that he suffers from Charcot's joint in his right foot. Notes from a consultation with Dr. Brooks on November 2, 2007, indicate that Brown reported a "history of Charcot joint on the right leg" and a "debridement of his right foot in the past." (R. 206-07.) Brooks indicated that x-rays show "Charcot joints of the right foot indicating significant peripheral neuropathy." (R. 208.) And later that month, at the time of Brown's dismissal from the hospital after his left-leg amputation, it was noted that Brown had a history of "[c]hronic difficulties with both feet including Charcot arthritis and wounds." (R. 197.)

After two months of physical therapy to teach him how to walk with a prosthetic device on his left leg, Brown could walk 1340 feet in six minutes. (R. 272.) Although that was an improvement from his pre-treatment ability to walk 580 feet, he was still classified as moderately limited. (*Id.*) He was able to cover 1600 feet without an assistive device, but only in a sheltered environment. (*Id.* 272-73.) And it was noted that he still used a walker in the community and required a wheelchair for prolonged distances. (*Id.*)

At the hearing, Brown testified that he uses a cane prescribed by his doctor to take some of the weight off of his right leg and help him balance. (R. 26-27.) He testified that his right leg swells every day and is painful. (R. 27.) His doctors have recommended that he elevate his leg to help reduce the swelling, but once he begins walking, it swells again. (R. 27-28.) He testified that he could not walk the length of a football field without taking a break. (R. 28.) He often has trouble putting on his shoes as a result of the swelling. (R. 29.) He moved in with his daughter and her young children, but he cannot care for the children because he cannot lift them or allow them on his lap due to the pressure it put on his legs. (R. 33.) He can sweep his room and prepare himself a sandwich or bowl of cereal, but is otherwise unable to cook, clean, or do his laundry. (R. 33.) Most of his time is spent lying down to take the pressure off of his legs. (R. 37.) Walking reportedly makes his physical problems worse. (R. 155.)

Despite this history and testimony, the ALJ concluded that Brown could perform light work, to include standing and walking for six

hours out of an eight-hour work day.   Although he noted Brown's peripheral neuropathy in his decision,[6] the ALJ reached his conclusion without specifically mentioning or addressing Brown's joint disease in his right foot.   And there is no evidence in the record directly supporting his conclusion that Brown can stand or walk for six hours out of an eight-hour workday.   In support, the ALJ relies upon a "physical residual functional capacity assessment" conducted by Dr. Robin Rosentock, M.D., on January 21, 2008.   (R. 19, 215.)   This assessment purports to estimate Brown's RFC one year from his date of onset, or on November 5, 2008.   When asked how long Brown could "[s]tand and/or walk (with normal breaks)," Rosenstock checked the box indicating "at least 2 hours in an 8-hour workday."   (R. 216.) Importantly, Dr. Rosenstock did **not** check the box indicating that Brown would be able to stand and/or walk "about 6 hours in an 8-hour workday."[7]

---

[6]The ALJ noted that "[i]n November 2007, there was evidence of significant peripheral neuropathy, but by March 200[8], his right lower extremity wound was well-healed." (R. 18.)   In support of that statement, the ALJ cites exhibit "12F, page 13." (*Id.*).   That page appears to be a report from a physical-therapy session on March 5, 2008, that indicates "[o]ther pertinent medical history: Prev R LE wound, now well healed cardiac stent placed 2006." (R. 252.)   From the grammar used in the report, it appears just as likely that the cardiac stent was what was "well healed" as the "[p]rev R LE wound." In any event, it is unclear to what right, lower-extremity wound this report refers.   It could have been Brown's prior big-toe infection or debridement on his right foot. *See* R. 254 (a physical-therapy report from the same day indicating that "R LE noted for well healed scar area just proximal to R medial ankle").   The Court would not anticipate "peripheral neuropathy" to be described as a "wound" that had been "well healed."

[7]At the bottom of the form, however, the words "stand/walk sl less than 6 hrs/day" have been typed onto the form.   This notation is not explained.   Even assuming it accurately reflects Rosenstock's prediction that, despite the wide discrepancy between the box checked on the form and the type-written note at the bottom of the page, Brown would be able, by November 2008, to stand and walk for **slightly less than** six hours per day, it does not support the ALJ's conclusion that he could stand or walk for at least that amount.

Furthermore, the ALJ discounts Brown's testimony regarding his symptoms by concluding that "his credibility is called into question by the evidence of noncompliance with his treatment plan." (R. 19.) The ALJ cites three pieces of evidence in support of that conclusion. One is an emergency-room report indicating that Brown had missed his blood-pressure medication that day, the second indicates that he ran out of one of his blood-pressure medications five days prior to an office visit with his doctor, and the third is, quite frankly, illegible. A few instances of missed medication hardly seems worthy of significantly discounting Brown's testimony, particularly in light of the fact that the record contained other references regarding Brown's compliance with his treatment.[8] *See Aguilar v. Astrue*, No. C-10-349, 2011 WL 3466863, *14 n.6 (S.D. Tex. July 28, 2011) (noting that "while noncompliance can properly count against credibility, . . . the occasional sign of disobedience toward medical orders contained in this record [in that case, not going to physical therapy] do[es] not support the adverse credibility finding").

## IV.  Conclusion

For the forgoing reasons, the Court concludes that the ALJ used a legally incorrect standard in determining the severity of Brown's impairments, and his RFC determination that Brown could stand and/or walk for six hours out of an eight-hour workday is not supported by

---

[8]For example, the reports from most of his physical therapy sessions indicate that Brown's "attendance is good" and he "appears to follow up [on] Home Exercise Program and home instructions." (R. 255, 256, 257, 261, 262, 263, 264, 265, 266, 267, 269.) Additionally, Brown testified about trying to keep his blood sugar under control now given that uncontrolled diabetes was likely what caused him to lose his left leg. (R. 31.)

substantial evidence.[9]   The decision of the Commissioner is thus REVERSED and this cause is REMANDED to the Commissioner for further proceedings consistent with this opinion.

SIGNED September 22, 2011.


_Terry R. Means_
_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

---

[9]Consequently, the Court need not address the second issue on appeal regarding the adequacy of the hypothetical question posed to the vocational expert.

OPINION ON APPEAL - Page 13
TRY/chr